UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DIALMASK, INC.,

        Plaintiff,

   v.

FIORENZO BRESOLIN, an individual; and
VITO DELLERBA, an individual,

        Defendants.

Case No. C15-1784RSM

ORDER DENYING DEFAULT JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Default Judgment. Dkt. #12. On May 31, 2017, the Clerk of this Court entered default against both Defendants. Dkts. #10 and #11. Plaintiff now seeks judgment in the form of a Declaration stating that Defendants do not have certain rights with respect to the intellectual property at issue. *Id.* The Court has reviewed the motion, which is now DENIED for the reasons discussed herein.

## II. BACKGROUND

Plaintiff filed the instant matter on November 13, 2015. Dkt. #1. Service on Defendant Dellerba was accomplished on December 11, 2015, and service on Defendant Bresolin was accomplished on January 18, 2016. Dkts. #5 and #6. Despite Defendants' failure to appear after being served, Plaintiff took no further action for more than one year. In fact, it was not until the Court issued an Order on May 10, 2017, setting forth certain case deadlines that

ORDER
PAGE - 1

Plaintiff finally moved for default. Dkts. #8 and #9. The Clerk of the Court entered default against Defendants, and this motion followed. Dkts. #10 and #11.

This case is a Declaratory Judgment action. Plaintiff DialMask, Inc. is a Washington corporation owned by three Washington residents: Mr. Aeron, Mr. Lau and Mr. Wang. Dkt. #1 at ¶ 2. Defendant Fiorenzo Bresolin is a resident of Palm Beach, Florida. *Id.* at ¶3. Defendant Vito Dellerba is a resident of Montreal, Quebec at ¶ 4. As set forth in the Complaint, the following facts led to the filing of this matter:

### Development of FauxPhone in 2012

9. Around June 2012, Mr. Aeron authored and prototyped an IPhone software application (the "FauxPhone App") which provided a valuable telecommunications interface. The FauxPhone App, written primarily as a "client side" application, was not distributed, commercialized, or licensed when it was developed.

10. Mr. Aeron put the FauxFone App on the backburner because, in June 2013, he began an MBA program at Cornell University where he met Mr. Lau, Mr. Wang, Mr. Bresolin, and Mr. Dellerba.

### Development of the BiziSpot App in 2014

11. Around February 2014, Mr. Aeron and Mr. Lau began a software project at Cornell called BiziSpot (the "BiziSpot App"). The BiziSpot App sought to simplify the appointment booking of service providers such as plumbers, electricians, barbers, *etc.* The BiziSpot App is not and was not a telecommunications application and had nothing in common with and was entirely separate and independent from the FauxPhone App.

12. While in Los Angeles around July 2014, Mr. Aeron discussed the formation of a company to support the development and marketing of the BiziSpot App with his Cornell classmate Mr. Bresolin.

13. In February 2015, Mr. Bresolin demanded a 40 percent interest in the entity that would market the BiziSpot App. The details were to be worked out later.

14. In May 2015, Mr. Aeron, Mr. Lau, Mr. Bresolin and Mr. Dellerba attended graduation at Cornell. Mr. Bresolin and Mr. Aeron again discussed BiziSpot.

15. In June 2015, Mr. Aeron, Mr. Lau, Mr. Bresolin and Mr. Dellerba met in Montreal to discuss the BiziSpot App. On day one of the Montreal meetings, Mr. Aeron and Mr. Bresolin met privately and verbally agreed to create a company to market the BiziSpot App (this entity will be referred to as the "BiziSpot Venture"). The BiziSpot App and the BiziSpot Venture are collectively referred to as "BiziSpot." Mr. Bresolin and Mr. Aeron agreed that the value of the BiziSpot Venture would be $1 million. They further agreed that Mr. Aeron's contributions to date would be valued at $600,000 (60 percent ownership) and that Mr. Bresolin would contribute $400,000 in cash (40 percent ownership). When bringing on any more partners, their respective shares would be diluted *pro rata*. The agreement was verbal, not written. Mr. Bresolin never contributed a penny of the promised $400,000 to the BiziSpot Venture.

16. On the second day of Montreal meetings, Mr. Aeron and Mr. Bresolin decided to give Mr. Lau and Mr. Dellerba 4 percent each in the BiziSpot Venture. Thus, the ownership breakdown for BiziSpot would be: Mr. Aeron at 55.2 percent; Mr. Bresolin at 36.8 percent; Mr. Dellerba at 4 percent and Mr. Lau at 4 percent. Again, there was no written agreement.

17. On July 2, 2015, Mr. Aeron registered "BiziSpot, Inc." as the entity for the BiziSpot Venture with the Washington Secretary of State. Since Mr. Bresolin had not contributed the $400,000 as promised, BiziSpot, Inc. was filed only in Mr. Aeron's name. A copy of this registration is attached as Exhibit 1.

18. In mid-July 2015, three of the classmates met in Seattle to discuss the BiziSpot Venture.

### Mr. Bresolin Declines Participation in FauxPhone App

19. During dinner the night of July 15, 2015, Mr. Aeron showed Mr. Bresolin the FauxPhone App from 2012. Mr. Aeron asked Mr. Bresolin if Mr. Bresolin was interested and offered to let Mr. Bresolin purchase a 10 percent interest in whatever came from the FauxPhone App for $150,000. Mr. Bresolin declined and said he was not interested. His only interest was in the BiziSpot App.

20. After Mr. Bresolin's rejection of participation in the FauxPhone App, Mr. Aeron decided to change the name from FauxPhone to DialMask and he registered the domain name "DialMask.com" on July 17, 2015.

21. Mr. Dellerba arrived in Seattle on July 18 and the classmates spent the day working through the business plan, financial plan and app features for the BiziSpot App.

ORDER
PAGE - 3

22. Mr. Dellerba left Seattle on July 19 and Mr. Bresolin left Seattle on July 21, 2015.

23. On July 21, 2015, Mr. Aeron and Mr. Lau met with a Seattle business owner to understand how his tanning shops managed appointments. The feedback taught Mr. Aeron and Mr. Lau that the market was highly competitive and that there were already apps that offered features above and beyond what the BiziSpot App purported to offer. Mr. Aeron and Mr. Lau concluded that, without considerably more features, the BiziSpot App would not be commercially viable.

24. On August 10, 2015, Mr. Aeron, Mr. Lau, Mr. Bresolin and Mr. Dellerba had a phone conference. Mr. Aeron discussed the visit with the business owner and stated that he was no longer interested in BiziSpot because it was not commercially viable. In addition, Mr. Aeron was exhausted from working long hours and never being paid for those hours. It was clear to Mr. Aeron that Mr. Bresolin would never invest the money he had promised to BiziSpot.

25. In the phone conference, Mr. Bresolin and Mr. Dellerba asked Mr. Aeron to take some time away and reconsider. Mr. Aeron declined and said his mind was made up.

**Development of the DialMask App and Launch of DialMask, Inc.**

26. On August 15, 2015, during a much-needed vacation with his family, Mr. Aeron called Mr. Lau and asked if Mr. Lau wanted to work on DialMask. Mr. Lau agreed, and the two agreed that Mr. Lau would own 15 percent of the venture.

27. Two days later, Mr. Aeron and Mr. Lau asked Mr. Wang, who had digital marketing experience, to join the DialMask project for 5 percent ownership. Mr. Wang agreed.

28. On August 22, 2015, Mr. Aeron registered DialMask, Inc. with the Washington Secretary of State. A copy of that registration is attached as Exhibit 2.

29. On August 31, 2015, Mr. Aeron, Mr. Lau and Mr. Wang signed a written "Partners' Agreement" detailing the ownership in DialMask, Inc. A copy of the written agreement is attached as Exhibit 3.

30. For the next month and a half, Mr. Aeron and Mr. Lau worked on rewriting of the DialMask App using the code from the 2012 FauxPhone App. This involved moving the "client side" code from the FauxPhone App

and rewriting into a "server side" application. This code rewriting was done by Mr. Aeron.

31. Mr. Aeron, Mr. Lau, and Mr. Wang agreed that the source code from the FauxPhone App and the source code from the DialMask App would be exclusively licensed to DialMask, Inc.

32. Mr. Aeron, Mr. Lau, and Mr. Wang then worked together to integrate the DialMask App with the website. Mr. Wang worked on the marketing plan.

33. Neither Defendant performed any work on DialMask whatsoever.

34. On October 10, 2015, the DialMask App was released on the Apple App Store. A copy of the Form W-9 submitted to Apple by DialMask, Inc. is attached as Exhibit 4. That form identifies DialMask, Inc., as a sole proprietorship. The reason was that, because the corporation was so new, the Apple database apparently did not recognize DialMask, Inc. as a corporation.

35. The DialMask App has received considerable praise from a variety of critics, including:

- AppAdvice (http://appadvice./com/appnn/2015/10/keep-your-number-private-with-dialmask);

- FeedMyApp (http://feedmyapp.com/review/don't-let-just-any-tom-dick-or-harriet-have-your-real-mobile-number/);

- Apps$Review (http://apps4review.com/iphone-ipad-apps/dialmask-juggling-many-live-in-one/); and

- TheiPhoneAppReview (Http://www.theiphoneappreview.com/2015/10/dialmask-iphone-app/).

36. On October 20, 2015, Mr. Bresolin texted Mr. Aeron to see how things were going. A copy of the full text exchange is attached as Exhibit 5. Relevant portions are summarized below.

37. Mr. Aeron responded by enthusiastically sharing the news about DialMask:

> Hey Fior. How is it going my friend? I have been busy at work as usual. On the side, Kelvin, Jackson and I got serious about a phone app named DialMask. So it's been really long busy days.

ORDER
PAGE - 5

The app has been released last week in Apple App Store. Market response was great. We have got over 12 independent reviews of our app from some very established app review sites.

Check it out here http://www.dialmask.com.

38. Mr. Bresolin's response was far from supportive:

I figured something was up. Why did you cut me out? It's not something that I would have ever expected from you or Kelvin.

39. Mr. Aeron attempted to explain that DialMask and BiziSpot were completely separate:

How can I/we cut you off from something that you were never even part of? This is a very different venture ***.

I thought you were actually going to congratulate us for making something happen ***.

This is not BiziSpot. I think somehow you are thinking it is the same. It's a different venture all together. There is really no relation whatsoever between BiziSpot and DialMask.

40. But Mr. Bresolin was unconvinced and escalated the discussion through severe allegations and threats of legal action.

My point nonetheless is a man of integrity would have never done what you did. Selfishness and greed is a dangerous trait.

I will be looking at options to avail ourselves of the injustice portrayed by your actions. *** I trust an equitable resolution will be realized absent the need to take formal action.

41. These text messages were followed by an email exchange between Mr. Dellerba and Mr. Aeron. A copy of the email exchange is attached as Exhibit 6. In relevant part, Mr. Dellerba reiterated what Mr. Bresolin had stated:

Should you elect to persist with this proposed course of action, we reserve the right to exercise any and all rights available to us under law, as appropriate, to remedy this situation and safeguard our interests.

42. On Monday, November 9, 2015, Mr. Aeron and Mr. Bresolin communicated by phone in an attempt to resolve the underlying issues as friends. Mr. Lau and Mr. Dellerba engaged in similar communications around the same time via text. However, such communications unfortunately failed to resolve the dispute.

43. The differences between the DialMask App and the BiziSpot App, which were explained in part by Mr. Aeron in Exhibit 6, include at least the following:

- BiziSpot and DialMask are two different ventures;
- There was never any commitment or agreement that either Defendant would have any interest in DialMask;
- The call functions that exist in the two apps are of completely different technologies;
- The classmates never discussed DialMask in Montreal;
- DialMask was created before BiziSpot was ever conceived;
- The DialMask App is not a "pivot" of the BiziSpot App; the DialMask App, through the FauxPhone App, came first and in mid-2012. At the time, Mr. Aeron did not even know the Defendants.

Dkt. #1 at ¶¶ 9-43.

Plaintiff now seeks a declaration that:

- Mr. Bresolin and Mr. Dellerba have no authorship or ownership interest in the FauxPhone App;

- Mr. Bresolin and Mr. Dellerba have no authorship or ownership interest in the DialMask App;

- Mr. Bresolin and Mr. Dellerba have no licensing rights in the FauxPhone App or the DialMask App;

- Mr. Bresolin and Mr. Dellerba are not entitled to purchase any shares in DialMask, Inc.;

- DialMask, Inc. is the exclusive licensee of the DialMask App and any copyrights associated with the DialMask App; and

ORDER
PAGE - 7

- DialMask, Inc. consists of three shareholders: Mr. Aeron, Mr. Lau and Mr. Wang.

Dkt. #1 at ¶ 48.

### III. DISCUSSION

#### A. Legal Standard for Default Judgment

Under Federal Rule of Civil Procedure 55, when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and the plaintiff does not seek a sum certain, the plaintiff must apply to the court for a default judgment. Fed. R. Civ. P. 55.

As a general rule, cases should be decided on the merits as opposed to by default, and, therefore, "any doubts as to the propriety of a default are usually resolved against the party seeking a default judgment." *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985)). Granting or denying a motion for default judgment is a matter within the Court's discretion. *Elektra Entm't Grp. Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005).

The Ninth Circuit has directed that courts consider the following factors in deciding whether to enter default judgment: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning the material facts; (6) whether defendant's default was the product of excusable neglect; and (7) the strong policy favoring decisions on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); *see also Elektra*, 226 F.R.D. at 392.

#### B. *Eitel* Factors

*1. Possibility of Prejudice to Plaintiff*

The first *Eitel* factor considers whether a plaintiff will suffer prejudice if a default judgment is not entered. Courts have concluded that a plaintiff is prejudiced if the plaintiff would be "without other recourse for recovery" because the defendant failed to appear or defend against the suit. *See also Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003). In this case, the Court questions whether Plaintiff would be prejudiced if the Court did not enter default judgment. Indeed, Plaintiff waited more than one year after Defendants failed to appear to take any action in this case. Moreover, Plaintiff fails to produce the patents to the FauxPhone App or the Dialmask App, thus it is not yet established that it owns those patents itself. Further, while Plaintiff argues that this case was brought to "clear title" because it is difficult to attract investors while there are potential claims against the intellectual property, or to liquidate its assets, there are no facts in the record to support that assertion. *See* Dkt. #12 at 4. In addition, Plaintiff has not alleged that Defendants have taken any legal or other action to assert rights against the property. As a result, the Court cannot determine whether Plaintiff will be prejudiced if the Court declines to enter default judgment. Accordingly, the Court finds that this factor weighs slightly against Plaintiff, or is at best neutral.

*2. Substantive Merits and Sufficiency of the Claim*

Courts often consider the second and third *Eitel* factors together. *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 941 (D. Ariz. 2013). The second and third *Eitel* factors assess the substantive merit of the movant's claims and the sufficiency of its pleadings, which "require that a [movant] state a claim on which [it] may recover." *See Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (stating that the issue is whether the allegations in the pleading state a claim upon which plaintiff can recover).

ORDER
PAGE - 9

Here, Plaintiff has pleaded a single Cause of Action, alleging a claim for declaratory relief. Dkt. #1 at ¶ ¶ 45-48. Under the Declaratory Judgment Act, this Court has authority to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *see also Government Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998). In order to fall within the Declaratory Judgment Act, a plaintiff must raise "a case of actual controversy within [the court's] jurisdiction." 28 U.S.C. § 2201(a). "The controversy must be definite and concrete, touch the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937) (citations omitted).

Plaintiff seeks a decree declaring that:

- Mr. Bresolin and Mr. Dellerba have no authorship or ownership interest in the FauxPhone App;
- Mr. Bresolin and Mr. Dellerba have no authorship or ownership interest in the DialMask App;
- Mr. Bresolin and Mr. Dellerba have no licensing rights in the FauxPhone App or the DialMask App;
- Mr. Bresolin and Mr. Dellerba are not entitled to purchase any shares in DialMask, Inc.;
- DialMask, Inc. is the exclusive licensee of the DialMask App and any copyrights associated with the DialMask App; and

- DialMask, Inc. consists of three shareholders: Mr. Aeron, Mr. Lau and Mr. Wang.

Dkt. #1 at ¶ 48. However, this request is problematic. Based on the Complaint, it is not clear that there is a definite and concrete controversy between the parties. While Plaintiff alleges that Defendants are seeking certain rights and ownership in the technology/intellectual property at issue in this suit, there are no allegations that Defendants have made any legal claims against the property, or that they have taken any action to the detriment of Plaintiff. Indeed, it appears that the only indication that Defendants are seeking an interest in the property, are text and email threats of legal action made nearly two years ago. Dkt. #1, Exs. 5 and 6. Further, the fact that Plaintiff took no action in this matter for more than a year, implies that no definite controversy has arisen. Moreover, in its motion for default judgment, Plaintiff states in conclusory manner that it "needs clarity" as to the claims made by Defendant against the property, but it fails to support that assertion with any evidence in the record. *See* Dkt. #12 at 4-5. Accordingly, the Court finds that Plaintiff has failed to present a concrete legal controversy that is real and not hypothetical, and that affects Plaintiff in a concrete and substantial manner. As a result, factors two and three weigh against default judgment.

*3. Sum of Money at Stake in the Action*

Under the fourth *Eitel* factor, the Court balances the amount of money at stake in relation to the seriousness of the defaulting party's conduct. *Eitel*, 782 F.2d at 1471-72. In this case, Plaintiff is not seeking any monetary judgment. Accordingly, this factor is neutral.

*4. Possibility of Dispute*

The fifth *Eitel* factor considers the possibility that material facts are disputed. *Eitel*, 782 F.2d at 1471-72. Plaintiff asserts that this factor is neutral. Dkt. #12 at 5. The Court agrees.

While Defendants appear to have disputed material facts during informal discussions between the parties, *see* Dkt. #1, Exs. 5 and 6, they also failed to respond to the instant matter. Therefore, it is not clear whether those facts remain in dispute.

*5. Possibility of Excusable Neglect*

The sixth *Eitel* factor considers whether Defendants' default may have been the product of excusable neglect. *Eitel*, 782 F.2d at 1471-72. Defendants were properly served and have had notice of this lawsuit for more than one year, yet they have failed to appear or take any other action. Accordingly, this factor weighs in favor of entry of default judgment.

*6. Policy in Favor of Decisions on the Merits*

Under the seventh *Eitel* factor, the Court takes into account the strong policy favoring decisions on the merits. While this preference, standing alone, is not dispositive, "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Thus, the seventh *Eitel* factor weighs against entry of default judgment.

*7. Conclusion Regarding the Eitel Factors*

Having examined the above *Eitel* factors, the Court finds that entry of default judgment is not appropriate, particularly given the deficiencies with Plaintiff's declaratory judgment claim noted above. *See Federal Nat. Mortg. Ass'n v. George*, 2015 U.S. Dist. LEXIS 88777, 2015 WL 4127958, *3 (C.D. Cal. July 7, 2015) ("The merits of the plaintiff's substantive claim and the sufficiency of the complaint are often treated by courts as the most important *Eitel* factors."). Therefore, the Court will deny Plaintiff's motion.

## IV. CONCLUSION

Having reviewed Plaintiff's motion, the Declaration in support thereof, and the remainder of the record, the Court hereby ORDERS that Plaintiff's Motion for Default Judgment (Dkt. #12) is DENIED.

DATED this 6 day of June, 2017.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE